## SOVEREIGN CAMP OF THE WOODMEN OF THE WORLD v. TREANOR.
### (No. 6300.)

(Court of Civil Appeals of Texas. San Antonio. Nov. 26, 1919. Rehearing Denied Dec. 31, 1919.)

1. INSURANCE ☞745—LAW AS TO MISREPRE-SENTATIONS TO FRATERNAL BENEFIT SOCIE-TIES NOT APPLICABLE.

The law that misrepresentations do not avoid a policy of life insurance unless material to the risk or actually contributing to the contingency has no reference, and does not apply, to fraternal benefit societies, such as the Woodmen of the World.

2. INSURANCE ☞723(6)—EXAMINING DOCTOR FOR FRATERNAL BENEFIT SOCIETY MUST RE-QUIRE ANSWER TO QUESTIONS IN APPLICA-TION.

An insurance contract written by a fraternal order, making it the duty of the examining doctor to require answer to every question, and to explain to the applicant the meaning of terms used, does not give the doctor or the applicant the right not to require or give an answer to a question as to previous medical attendance, because he may not have thought the thing for which he previously prescribed and treated the applicant was a disease within the meaning of the term as used.

3. INSURANCE ☞723(6)—COLD AND FEVER A "DISEASE" WITHIN FRATERNAL BENEFIT CER-TIFICATE.

The word "disease," as used in an insurance contract, made by a fraternal order and application question as to previous medical attendance, comprehended a cold and fever, being a morbid condition of body, and having as synonyms "disorder," "distemper," and "malady."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Disease.]

4. INSURANCE ☞723(6)—FAILURE TO DIS-CLOSE MEDICAL CONSULTATION RENDERS CER-TIFICATE OF BENEFIT COMPANY VOID.

A fraternal order had a right to a truthful answer from its applicant for membership as to whether he had consulted physicians prior to his application; and, failing to get such answer, the applicant in fact having consulted physicians for a cold and fever, coming within the term "disease" as used in the contract of insurance, though he represented he had not done so, the insurance was rendered void.

Appeal from District Court, Bexar County; S. G. Tayloe, Judge.

───────────

Suit by Cora de La Pena Treanor against the Sovereign Camp of the Woodmen of the World. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

E. D. Henry and Atlas Jones, both of San Antonio, for appellant.

COBBS, J. This suit was brought by Cora de La Pena Treanor, as plaintiff, against the Sovereign Camp of the Woodmen of the World, as defendant, to recover the sum of $2,000 upon an insurance certificate alleged by the plaintiff to have been issued by defendant May 21, 1917, to Jose Treanor in the sum of $2,000, payable on the death of said Jose Treanor to said plaintiff as beneficiary.

The trial was before a jury upon special issues, and upon the answers of the jury the court rendered judgment for plaintiff. A motion for new trial was filed by defendant, but the same was overruled, whereupon this appeal was perfected.

There is no brief filed for appellee.

The first assignment of error contends the court erred in not giving the charge requesting an instructed verdict for appellant, because the uncontradicted evidence showed the insured had consulted and had been attended by a physician for a disease or injury during the five years preceding May 14, 1907.

The evidence on this phase of the case is that the application by insured was made on the 14th day of May, 1917, before R. Fernandez, M. D., camp physician for appellant. The application required the physician to explain to the applicant the meaning of the terms employed in the application. In the application he stated he had not had syphilis. He stated he had not consulted or been attended by a physician for any disease or injury during the past five years. In the certificate of Dr. R. Fernandez he states the applicant has "no tendency or predisposition to consumption or nervous disease, and free from syphilitic taint." Further, " * * * Believe the applicant to be in good health and safely insurable * * * and recommend that a beneficiary certificate be issued to him." Further, " * * * that applicant has never been afflicted with any disease of the brain or nervous system," and stated further he had never "prescribed for him."

The benefit certificate, among other things, provides:

"The consideration for this certificate is the application and medical examination on which the Sovereign Physician based this acceptance and approval of the application of the person within named for membership, and is issued in consideration of the representation, warranties and agreements made by the said person in his application to become a member and in his medical examination as accepted and approved by the Sovereign Physician," etc.

The application of insured for the certificate of insurance sued upon provided that it was a part of the contract of insurance between insured and defendant, and contained the following:

"I hereby certify, agree and warrant that all the statements, representations and answers in this application, consisting of two pages as aforesaid, are full, complete and true, whether written by my own hand or not * * * and I agree that any untrue statements or answers made by me in this application * * * or to the examining physician, or any concealment of facts in this application or to the examining physician, intentional or otherwise, * * * my beneficiary certificate shall become null and void and all rights of any person or persons shall be forfeited."

And under the answers which insured made in his medical examination in said application he made this statement:

"For the purposes of this application I declare and warrant the foregoing answers and statements to be correct."

The plaintiff testified her husband had been sick once before the application; that Dr. Fernandez treated him for cold or la grippe, or something akin to that; that he consulted Dr. Paloma for a bad toothache, also with Dr. Belgerman for stomach trouble.

Dr. F. Fernandez testified:

"That he saw insured once at insured's home prior to insured's application for insurance. That was before May 14, 1917. That insured was walking around and had some fever, and he told insured's wife to put him to bed, and to tell him how he felt. That they never called him again. That when he called on insured at his home insured had some fever and was complaining—a general malaise. That when he called on insured on that occasion insured told him what seemed to be the matter with him—a little malaise—a little fever. That he told insured's wife that she would better put him to bed, and if they needed him to let him know. That he prescribed for insured symptomatically; that he gave him some quinine, sodium, salicylate, or citrate, and he was not called any more. That at that time he asked insured what was the matter with him, and insured told him he was suffering. That insured seemed to be sick, and discussed the matter with him, and he prescribed for insured. That insured consulted him professionally after insured became a Woodman of the World, and that the time of this consultation was about nine months after insured became a member and at which time insured complained of an intense headache, which he thought was optical or gastric in origin. That by optical he meant due to some disturbance of the optic nerve, and that by gastric he meant some disturbance of the stomach. That he was not sure which was the trouble, but that insured did complain of an intense headache. That he was not sure of his diagnosis for the reason that they called him and treated insured symptomatically and the symptoms disappeared and he never called again. * * * That he asked the question, 'Have you consulted or been attended by a physician for any disease or in-

jury?' That that question included any disease. That the application sets out distinctly and specifically the diseases a man must suffer from and which are considered serious diseases which would bar him from becoming a member upon examination made by the medical examiner for the Woodmen of the World. That from the examination he made he found that insured was all right, and that insured was not suffering from any disease at that time. That he found him well. That insured responded to the treatment which he gave him for a slight cold before that time. That he only went there and prescribed for an ordinary cold, a trivial matter. That there were no symptoms. That that was no injury, and that it was not a disease; that it was the same as you would walk into any house and find some one suffering from a cold and prescribe, break the fever and clear up the cold. That a headache might be caused -from the eyes or the stomach."

Dr. Watts testified that about May 12, 1917, the insured consulted with him at that time "concerning a disease or injury professionally; that at that time insured complained of vomiting, but did not then form an opinion, but did the next day after he had caused his eyes to be examined, as he suspected the vomiting and dizziness was referable to or had something to do with the optic tract. He pronounced his disease as syphilis. He treated him thereafter for that disease, from which he died.

Dr. S. C. Applewhite, an eye specialist, stated:

'That he examined insured's eyes on May 12, 1917, in consultation with Dr. Watts. "That insured consulted him concerning his eyes at that time. That he did not remember exactly what he stated; that Dr. Watts brought insured to him and asked an ocular examination, and he examined insured with that in view. That Dr. Watts did not remain during the examination. That Dr. Watts asked him to examine insured's eyes, and that he did. That he found something wrong with insured's eyes from his examination, and he formed an opinion from his examination as to what was wrong. That he found that insured had pressure on the optic nerve in addition to being far-sighted, and that he also had inflammation of the optic nerve. That in his opinion the inflammation was in his optic nerves—in the entire optic nerve before it came down from his brain into his eyes. That it was in both eyes. That in his opinion insured's entire optic nerves were inflamed. That at the time he examined insured he formed an opinion from his examination as to what caused the inflammation. That the first thing he thought of was syphilis. That he could get no history from insured of his ever having had syphilis, but, that being the most common cause of this kind of trouble which insured had, it was the first thing he thought of, and that he communicated that fact to insured's doctor. That he had never changed his opinion on the matter, and that he still had the same opinion."

The case was submitted to the jury on special issues, which, with the answers, are as follows: .

"Question No. 1. Did the deceased, Jose Treanor, at the time he made application for the issuance of the certificate sued on, have the disease known as syphilis * * *? Answer: He did not. .

"Question No. 2. Did Jose Treanor, deceased, within the period of five years immediately preceding the making the application for the issuance of the certificate sued on, consult a physician on account of any disease or injury * * *?" Answer: He did not.

"Question No. 3. Was Jose Treanor, deceased, attended by any physician for any disease or injury within the period of five years immediately preceding the making of the application for the issuance of the certificate sued on? Answer: He was not."

That the insured did consult a physician for a disease or injury during the five years preceding May 14, 1917, is shown by the testimony of all the witnesses whose testimony is briefly set out above. The plaintiff herself has stated that prior to his application he consulted several doctors, one of whom was Dr. Fernandez, who took his application, who stated he did not consult a physician for a disease. We observe there is an obvious contradiction in the doctor's statement and testimony, for in his oral examination he says he was consulted by insured and prescribed for him. His contradiction of himself may be explained by his conception of the word "disease," for he says:

"The application sets out distinctly and specifically the diseases a man must suffer from and which are considered serious diseases which would have prevented him from becoming a member upon an examination made by the medical examiner for the Woodmen of the World."

Plaintiff herself remembered that insured once before his application came home and had a cold or la grippe or something like that, and was, as stated, treated for it by Dr. Fernandez.

The question asked insured was: "Have you ever consulted or been attended by a physician for any disease or injury during the past five years?" to which he answered "No." Is that answer true or false?

[1] The law that misrepresentations do not void a policy unless it is material to the risk or actually contributes to the contingency has no reference and does not apply to fraternal benefit societies such as this. Modern Order of Prætorians v. Hollmig, 100 Tex. 625, 103 S. W. 476; Modern Order of Prætorians v. Davidson, 203 S. W. 379.

[2, 3] Under the terms of the insurance contract, it is made the duty of the doctor to require an answer to every question, and to explain the meaning of terms used, but that does not give the doctor the right not to require an answer to the questions because he. may not have thought the thing for which he prescribed and treated applicant was a disease within the meaning of the term. About the time he made the application, and

soon after he treated him for cold, two doctors found serious trouble, from which he died. Besides, the word "disease" comprehends a cold and fever, as Webster defines the word "disease" as: "A morbid condition of body; sickness"—and gives the words "disorder" and "distemper" and "malady" as synonyms of the word "disease." Insured was sick enough to remain at home and to consult and to be attended by a physician. He was sick enough for his physician to prescribe medicine for him and to tell him to go to bed, and he had a cold and fever, and it is clear to us that insured's cold and fever was a disease comprehended by the plain and commonly understood meaning of the word "disease" contained in said question. The appellant had a right to ask all such questions, so that the medical examiner would be able to pass upon the application to determine the risk or seek further information if desirable. Neither the applicant nor the doctor making the examination had the right to pass upon what questions to answer or the materiality thereof. Those questions were there for some purpose, and required a truthful answer. The word, "disease" embraces the very ailments for which the doctor treated him prior to the application.

In the case of Mutual Life Insurance Co. v. Simpson, 88 Tex. 337, 31 S. W. 502, 28 L. R. A. 765, 53 Am. St. Rep. 757, it is said:

"The word 'disease' may include, and is often used to designate, ailments more or less trivial. Medical science, as expounded by its experts, has not definitely determined all of the physical ailments which indicate a vice in the constitution, or have a direct tendency to shorten life. Through abundant caution the insurance company may, if it elects, inquire about any ailment, and take a warranty concerning it, lest it might affect the risk, although it cannot be known that it will."

As said in Life Association v. Harris, 94 Tex. 38, 57 S. W. 640, 86 Am. St. Rep. 813, quoting from a Pennsylvania case:

" 'The eighth interrogatory in the application is: "Have you had any medical attendance within the last year prior to this date? If so, for what disease? Give name and address of the doctor in full." The object of this inquiry is manifest. If the assured had no medical attendance within the time prescribed, and so answers, that is the end of it. But if he had such attendance, then the company is entitled to know for what cause he had medical advice or aid, and the name and address of the doctor, in order that they may ascertain the particulars from him. And, if the assured falsely answer that he had no medical attendance, he is not entitled to recover.' And, further: 'In Wall v. Royal Society, · 179 Pa. 355, 36 Atl. 748, the questions and answers related to the health of the insured, and the attendance of a physician. The judgment was reversed on the ground, substantially, that it was competent for the defendant company to prove the falsity of the answers, without regard to the question whether they were warranties or only misrepresentations.' In Lutz v. Insurance Co. [186 Pa. 527], 40 Atl. 1104, it appeared that in the application false answers were made to several questions, one of which was, 'Have you ever consulted any other physician? A. No.' And the same court said: 'Where it was doubtful whether the matter was material, the question of materiality must be submitted to the jury, but, where the matter involved was· palpably and manifestly material to the risk, the law was not changed, either by the act of 1885, or by any decision before or since. Thus, in the present case, all the questions above enumerated were intrinsically and essentially material to the risk, and have always been so held by all courts of last resort.' " United Benev. Association v. Baker, 141 S. W. 541; Joyce on the Law of Insurance (2d Ed.) § 2070, and notes; Modern Order of Prætorians v. Hollmig, 100 Tex. 623, 103 S. W. 476; Modern Order of Prætorians v. Davidson, 203 S. W. 379.

Appellant's sixth assignment of error complains it was error in the court not to have given the peremptory instruction to the jury requested by defendant, because plaintiff did not sufficiently allege the terms and conditions of the contract sued upon, and that they had been complied with so as to have the case submitted to the jury, citing Woodmen of the World v. Cooper, 208 S. W. 551, and Assurance Co. v. Dunbar, 7 Tex. Civ. App. 421, 26 S. W. 628.

[4] From the view we take of the case it is not necessary for us to pass upon this assignment. All the other assignments are germane to and relate to the action of the court in submitting to the jury the issues in respect to the truth or falsity of the answers of the insured. The answers of the jury to question No. 2, that insured did not "consult a physician within five years prior to his application on account of any disease or injury," and to No. 3, that within such period no physician had attended him for any disease or injury, are in direct conflict with the testimony. Since the court refused to instruct a verdict, or to set it aside, we assume the case was tried upon a misapprehension of what was embraced within the term "disease." The authorities cited above do not leave a doubt that the ailments for which he did consult physicians came within the term "disease." The appellant had the right to a truthful answer, and, failing to get one, the insurance was rendered void. The testimony that he did consult physicians prior to his application, that medicine was prescribed for him, and that he took it is wholly undisputed. We can see no good to come from a new trial, because there is no probability that that evidence can ever be changed, and the result must always be the same. Railway v. Schmidt, 61 Tex. 286; Choate v. Railway, 90 Tex. 88, 36 S. W. 247, 37 S. W. 319; Modern Order of Prætorians v. Davidson, 203 S. W. 379; Life Ins. v. Harris, 94 Tex. 39, 57 S. W.

635, 86 Am. St. Rep. 813; United Benevolent Association v. Baker, 141 S. W. 544.

The court erred in submitting the case to the jury to find issues that were undisputed, for on the undisputed evidence appellant was entitled to a judgment. The judgment of the court is set aside, and judgment here rendered for appellant.

Reversed and rendered.

MOURSUND, J., did not sit in this case.